## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

United States of America

      Plaintiff,

                                   Case No. 22-20005

v.                                    Hon. Denise Page Hood

Antonio Capozzoli,

      Defendant.

_____/

## ORDER DENYING DEFENDANT'S
## MOTION TO SUPPRESS [ECF No. 16]

## I.    Introduction

Defendant Antonio Capozzoli is charged with Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1). The charge is based upon evidence allegedly recovered during an encounter between Detroit Police Department ("DPD") officers and Defendant on or about September 2, 2021 and subsequent statements made by Defendant.  Defendant filed a Motion to Suppress [ECF No. 16] claiming that: (1) the stop and search was unlawful; and (2) the statements obtained by the DPD officers were in violation of Defendant's *Miranda* rights.  The Government filed a response, and Defendant did not file a reply.  The Court held a hearing on the Motion to Suppress on June 3, 2022, after which each party filed a supplemental brief.  For the following reasons, Defendant's Motion to Suppress is denied.

## II.    Factual Background

At the June 3, 2022 hearing, the Government called two witnesses, DPD officers Nicole MacDonald and Tamika Adams.   Defendant did not call any witnesses.  The parties stipulated to the submission to the Court of video evidence consisting of bodycam footage from each of DPD officers Tamika Adams, Nicole MacDonald, and Jackson Vansickle, as well as dashcam footage from the DPD vehicle that transported Defendant from the crime scene to the Detroit Detention Center ("DDC").

At approximately 10:45 p.m. on September 2, 2021, the DPD officers were heading eastbound on 8 Mile Road after leaving the Gulf gas station parking lot. The bodycams of each officer, as well as the dashcam on the DPD vehicle, had been activated by this time.  At the outset of each bodycam video, the video is visible but the audio is not audible (the dashcam has no audio).  Officer MacDonald noticed a man, later identified as Defendant Antonio Capozzoli, standing at a nearby bus stop. Officer Vansickle communicated that it appeared Defendant had the imprint of a pistol on his right side. The officers pulled over to where Defendant was standing.

Officer MacDonald exited the DPD vehicle, and she testified that she asked Defendant if he had a CPL (concealed pistol license).  Defendant responded that he did not (this exchange was not audible on the bodycam videos). Officer MacDonald then asked, "Is that a gun right there?" while pointing at Defendant's right hip.

Defendant responded, "just for my protection." Upon receiving Defendant's response, Officer MacDonald grabbed Defendant's arm and began to handcuff him. Officer Vansickle lifted Defendant's shirt at his right hip and instructed Officer Adams to pull a pistol out of Defendant's waistband, which she did.  Officer MacDonald asked Defendant whether he had identification on him, where it is, and whether there was anything else in his pockets the officers needed to worry about, and she frisked him.

Defendant made numerous unprompted statements and asked questions throughout his arrest and transport to the Detroit Detention Center ("DDC").  He stated that the firearm belonged to his girlfriend, in response to which Officer MacDonald explained that Defendant's statements were being audio and video recorded and that he was under arrest for carrying a concealed weapon. During the officers' transport of Defendant to the DDC, Defendant asked numerous questions regarding the procedure for the arrest and processing given the ongoing pandemic. When the officers stated that he would not remain in custody in Wayne County as long as he didn't have a "crazy record," Defendant stated that he is a felon but been out of prison for 5 years.

## III.    Applicable Law

The Fourth Amendment protects individuals against "unreasonable searches and seizures" by the government. U.S. Const. Amend. IV. Such protections extend

3

to brief investigatory stops of persons or vehicles that fall short of traditional arrest. *Terry v. Ohio*, 392 U.S. 1, 9 (1968); *United States v. Cortez*, 449 U.S. 411, 417 (1981). There are three kinds of permissible encounters between police and citizens: "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention or *Terry* stop, which, if non-consensual must be supported by reasonable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010).

A *Terry* stop is permissible only if law enforcement officers have a "particularized and objective basis for suspecting the particular person stopped of criminal activity and were aware of specific and articulable facts which gave rise to reasonable suspicion." *United States v. Keith*, 559 F.3d 499, 503 (6th Cir. 2009) (internal quotes omitted); *Mitchell v. United States*, 233 F. App'x 547, 552 (6th Cir. 2007); *United States v. Cortez*, 449 U.S. 411, 417 (1981). To justify an investigatory stop, an officer must observe some objective manifestation that the person stopped is, or is about to, engage in criminal activity. *United States v. Moberly*, 861 F. App'x 27, 29 (6th Cir. 2021) (citing *Robinson v. Howes*, 663 F.3d 819, 828 (6th Cir. 2011)). "An officer must not act on an 'inchoate and unparticularized suspicion or hunch, but [on] the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *United States v. Abdi*, 827 F. App'x 499, 504 (6th Cir.

4

2020 (quoting *Terry*, 392 U.S. at 27). Reasonable suspicion is an objective standard, simple good faith on the part of the officer is not enough. *Terry*, 392 U.S. at 22. "The determination of whether reasonable suspicion existed must be based on the totality of the circumstances." *United States v. Johnson*, 620 F.3d 685, 692 (6th Cir. 2010).

In examining the constitutionality of a *Terry* stop, a court must address two questions. First, whether there is a proper basis for the stop. *United States v. Davis*, 514 F.3d 596, 608 (6th Cir. 2008). The second question is whether the degree of intrusion exceeded the scope of the circumstances. *Id*. The authority to conduct a *Terry* stop is "narrowly drawn" to permit a reasonable search for weapons for the protection of the police officer "when they have reason to believe that the person with whom he is dealing with may be armed and presently dangerous." *Terry*, 392 U.S. at 30.

## IV.   Analysis

The Complaint indicates that the officers stopped to investigate Defendant after they observed him standing at a bus stop with "a handgun grip protruding from [his] waistband." ECF No. 1, PageID.4.  Officers MacDonald and Adams testified that Officer VanSickle stated that he saw an imprint of a pistol under Defendnat's shirt.  Defendant contends that the officers had no reasonable suspicion of criminal activity to justify or conduct an investigation for anything.  Defendant contends that

when Officer MacDonald asked Defendant whether he had a CPL and then whether he had a gun on him, the officers commenced a warrantless, illegal search and seizure of his person in violation of the Fourth Amendment and *Terry*.  Defendant argues that, not only should the seized firearm be suppressed, but his statements also should be because they are fruits of those violations and, with respect to statements after his arrest, fruits of a violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Missouri v. Seibert*, 542 U.S. 600, 604 (2004).

### A. The Stop

The Government argues that Officer VanSickle saw the firearm grip extending from Defendant's right waistband and communicated that to Officers MacDonald and Adams.  The Government maintains that such information gave the officers reasonable suspicion that Defendant was carrying a concealed firearm.  The Government contends that this reasonable suspicion formed the basis for Officer MacDonald to ask if Defendant had a CPL.  Because Defendant indicated that he did not have a CPL, the Government claims Officer MacDonald was justified in asking Defendant whether he had a gun on him.  And, when Defendant responded, "it's for my protection," the Government asserts that Officer MacDonald acted reasonably by grabbing Defendant's arm (seizing him), having the other officers search Defendant's person and remove the firearm from the area of his right hip, where they reasonably suspected the firearm to be.  The Government states that, having

6

confirmed that Defendant possessed a firearm without a CPL, as he admitted, the officers had probable cause to arrest Defendant for carrying a concealed weapon without a license.

The Government argues that when the officers initiated the *Terry* stop – that is, pulling up to Defendant and asking him questions, "they had a particularized and objective basis to suspect that [Defendant] was unlawfully carrying a concealed firearm." ECF No. 18, PageID.54.  The Government maintains that Michigan law makes it unlawful (a crime) for a person to "carry a pistol concealed" on her or his person or in a vehicle without a license to do so. M.C.L. § 750.227(2).  Based on this statute, the Government asserts that it is presumptively illegal under Michigan law to carry a concealed firearm.

It is undisputed that a person must have a license on their person "at all times he or she is carrying a concealed pistol" and must "show" the license "upon request by [a] peace officer." M.C.L. § 28.425f. *See also* M.C.L. § 750.231a (a license is an exception to the prohibition against carrying a concealed pistol).  As the Government states, a person licensed to carry a concealed pistol (weapon) who is stopped by a police officer must immediately disclose to the police officer that he or she is carrying a pistol. M.C.L. § 28.425f; M.C.L. § 776.20 (in any prosecution for violating a Michigan law that relates to the use, licensure, or possession of firearms,

"the burden of establishing any exception" is on the defendant but "does not shift the [prosecution's] burden of proof.

The Government believes that, the evidence that Defendant concealed a pistol on his person, in itself, makes out a "prima facie case" of criminal activity, a presumption that can be overcome if Defendant produces some evidence of licensure.  For that reason, the Government argues that it need not show the absence of a license to establish the felony offense of carrying a concealed weapon under M.C.L. § 750.227(2). *See People v. Henderson*, 218 N.W.2d 2 (Mich. 1974); *People v. Perkins*, 703 N.W.2d 448 (Mich. 2005); *United States v. Bell*, 572 F. App'x 417, 419 (6th Cir. 2014) ("the officer's belief, based on his eyewitness observations, that the defendant had a bulge in his pocket that was in the shape of a gun provides 'reasonable suspicion' under the *Terry* doctrine that the defendant was carrying a concealed pistol.").  *See also United States v. Williams*, 483 F. App'x 21, 27 (6th Cir. 2012) ("[M]erely showing that a defendant carried a pistol in a vehicle he owns or operates establishes a prima facie violation of state law; at that point, it is up to the defendant to raise the issue of licensure and offer proof that his possession was lawful."); *United States v. Galaviz*, 645 F.3d 347, 356 (6th Cir. 2011) (Fourth Amendment challenge in a case involving a concealed pistol in Michigan denied, as the incriminating nature of the pistol was immediately apparent because MCL 750.227(2) makes it unlawful to carry a pistol in a vehicle without a license and

MCL 776.20 places the burden on the defendant to produce the license).  The Government contends that *Galaviz* is binding because whether the pistol is concealed in a vehicle or on the defendant's person, the same statutory framework governs.

The Government asserts, and the video and testimony supports that assertion, that the DPD officers did not grab Defendant's arm or seize the firearm concealed on his right side until after Defendant responded to Officer MacDonald that he did not have a CPL and did have a gun on him.  It is well-established that those questions are permissible and do not violate a Defendant's *Miranda* rights. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (recognizing that, during a *Terry* stop, an officer may "try to obtain information confirming or dispelling the officer's suspicions"); *United States v. Steen*, No. 21-20012, 2021 WL 5036152, at *1–*5 (E.D. Mich. Oct. 27, 2021) (Michelson, J.) (citing MCL § 28.425f and finding that officers had probable cause to arrest defendant who was carrying a concealed firearm in his waistband in a high crime area and fled from police prior to them asking whether he had a CPL).

The Government also relies on a case from this district that involved a consensual encounter similar to the encounter between the DPD officers and Defendant.  In that case, the court concluded that officers had reasonable suspicion to seize the defendant after he admitted he was armed, and he was already detained

9

by officers on that basis as they determined whether or not the defendant had a valid CPL. *United States v. Leverett*, No. 19-20098, ECF No. 36 (E.D. Mich. July 24, 2019) (Cohn, J.).  The seizure was deemed lawful because, once the defendant admitted that he was armed, the officer "could then take reasonable steps to investigate whether [the defendant] was carrying the gun lawfully." *Id.* at PageID. 229. *See also United States v. Bridges*, 2016 WL 3922354 (E.D. Mich. July 21, 2016) (officers were entitled to handcuff defendant, place in him patrol car, and check computer to determine if defendant had a CPL).[1]

---

[1] The Government cites other courts that have found that, if a person carrying a concealed weapon is presumptively unlawful in the state, that established reasonable suspicion for a *Terry* stop under the Fourth Amendment. *United States v. Pope*, 910 F.3d 413, 416 (8th Cir. 2018) ("carrying a concealed weapon in **Iowa** is presumptively criminal . . . thus we think the officer had reasonable suspicion that criminal activity was afoot when he personally observed Pope place the gun in his waistband."); *United States v. Ferguson*, No. 19-3894, 2020 WL 10140803, at *3 (6th Cir. June 3, 2020) (officers lawfully conducted a *Terry* stop based on a visible firearm in the defendant's car because a loaded firearm in a vehicle is presumptively unlawful in **Ohio**); *United States v. Gatlin*, 613 F.3d 374, 378 (3rd Cir. 2010) (**Delaware** officers had reasonable suspicion that defendant was engaged in a crime based solely on information that he was carrying a concealed handgun because doing so is presumptively unlawful in that state).

The Government acknowledges that, where gun possession is presumptively lawful by statute, courts have found that officers lack reasonable suspicion of criminal activity simply because there is a visible firearm. *See, e.g., Northrup v. City of Toledo Police Dep't*, 785 F.3d 1128, 1132–33 (6th Cir. 2015) ("[w]here it is lawful to possess firearms, unlawful possession is not the default status"); *United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013) ("where a state permits individuals to carry firearms, the exercise of this right, without more, cannot justify an investigatory detention"); *United States v. Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000) (the court

Other courts in this district, however, have concluded that law enforcement officers in Michigan have no reasonable suspicion to conduct a *Terry* stop based on unparticularized hunches that a person is carrying a firearm. *See United States v. Robinson*, No. 15-cr-20248, (E.D. Mich. Aug. 3, 2015) (police lacked reasonable suspicion to conduct a *Terry* stop based upon M.C.L. 257.655, where a citizen was merely crossing a residential street and police allegedly observed a firearm in his pocket); *United States v. Davis*, 554 F. App'x. 485, 489-90 (6th Cir. 2014) (holding that stop and search were unsupported by reasonable suspicion where police, in an unmarked car, approached defendant walking near a gas station and proceeded to detain and search him based upon defendant reaching into a pocket with bulge in it). *See also United States v. Beauchamp*, 659 F.3d 560 (6th Cir. 2011) (holding that insufficient reasonable suspicion existed where defendant walked away from police, police ordered defendant to stop and then questioned defendant as to his whereabouts); *United States v. See*, 574 F.3d 309 (6th Cir. 2009) (without additional objective indications of criminal activity, there was no reasonable suspicion to stop defendant for merely being parked in a high crime area at night).

Based on the briefs, testimony, and video, the Court finds that Officers MacDonald, Adams, and VanSickle approached Defendant solely on the basis of

---

invalidated a Terry stop based upon the suspicion of gun possession at a street festival because local law permitted public possession of firearms).

their belief that Defendant had a concealed weapon on his person, as witnessed by Officer VanSickle and communicated to Officers MacDonald and Adams.  Having *seen* a concealed weapon, the officers had reasonable suspicion to investigate whether Defendant in fact had a firearm on his person, including by approaching him and asking Defendant questions.   The officers did not search or seize Defendant's person immediately; rather, they approached Defendant and asked whether he had a CPL and a gun.  When Defendant indicated he did not have a CPL but did have a gun, the officers had probable cause to arrest Defendant.  The Court holds that the officer's conduct was the result of a legal *Terry* stop, for the reasons and pursuant to the rules set forth in *Bell, Williams*, *Galaviz*, *Berkemer*, and *Leverett*.

For the foregoing reasons, the Court denies Defendant's motion to suppress with respect to the officers' seizure of the gun from Defendant at the bus stop.  As that search and seizure was legal, subsequent evidence obtained from Defendant at the bus stop and during transport to the DDC will not be suppressed simply based on the search and seizure at the bus stop.

## B. Suppression of Statements

Defendant argues that his statements made at the bus stop should be suppressed as fruits of a Fourth Amendment violation because he was coerced and pressured into making statements during the stop, search and seizure at the bus stop. As noted above, however, the search of Defendant's person at the bus stop was not

12

illegal and does not operate to establish a poisonous tree from which inculpatory evidence was obtained.

Defendant next contends that his statements to the DPD officers must be suppressed because they were not made voluntarily and independently, as acts of free will. Defendant asserts that they were obtained in violation of his Fifth Amendment *Miranda* rights. Citing *Wong Song v. United States*, 371 U.S. 471, 486 (1963); *United States v. Lopez-Arias*, 344 F.3d 623, 699 (6th Cir. 2003). Defendant claims that the entire interaction between he and the DPD officers was "tainted by the illegal conduct of the officers and the undue pressure th[ey] placed on" Defendant.

It is well-established law that the Government has the burden to show that the statements were made voluntarily and as independent acts of free will. *Brown v. Illinois*, 422 U.S. 590, 604 (1975). The Government acknowledges that *Miranda* requires law-enforcement officers to give warnings, including the right to remain silent, before interrogating individuals whom the officers have placed "in custody." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (internal quotation marks omitted). In drawing the line between a non-custodial encounter between a citizen and the police (where *Miranda* does not apply) and a custodial encounter (where it does), courts consider "all of the circumstances" surrounding the encounter, with "the ultimate inquiry" turning on whether "a formal arrest" occurred or whether there

was a "restraint on freedom of movement of the degree associated with a formal arrest." *Id*. (internal quotation marks omitted).

To answer that question, courts focus on the "objective circumstances of the interrogation," to determine "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." *Id*. at 325 (internal quotation marks omitted). Several factors guide the inquiry: the location of the interview; the length and manner of questioning; whether the individual possessed unrestrained freedom of movement during the interview; and whether the individual was told she need not answer the questions. *See United States v. Swanson*, 341 F.3d 524, 529 (6th Cir.2003).

Certain pre-arrest questioning pursuant to a *Terry* stop is not subject to *Miranda*.   In those situations, police officers may ask a moderate number of questions to confirm or dispel the suspicion:

> the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released. The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that Terry stops are subject to the dictates of *Miranda*. The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not "in custody" for the purposes of *Miranda*.

*Berkemer*, 468 U.S.at 439–40.

14

In this case, the questions Officer MacDonald asked Defendant regarding whether he had a CPL or a gun were made in the context of a *Terry* stop and to confirm or dispel the officers' suspicions that Defendant illegally possessed a firearm.  Defendant was not in custody, and he had the right to answer or not answer those questions in a noncoercive setting.  Accordingly, *Miranda* did not apply to those questions and does not serve to bar the use of Defendant's responses to those questions.

Once Officer MacDonald grabbed Defendant's arm and he was placed under arrest, *Miranda* was implicated.  It is undisputed that the DPD officers did not advise Defendant of his *Miranda* rights at the time of his arrest or at any time prior to turning him over to the MDOC at the DDC.  It also is undisputed that Defendant made a number of inculpatory statements while being arrested at the bus stop and while the DPD officers were transporting Defendant in the DPD vehicle to the DDC.

Statements volunteered by a defendant while in custody are not implicated by *Miranda*, as reflected in that decision.  The Supreme Court held that "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Id*. at 478.  "[T]he special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." *Rhode*

*Island v. Innis*, 446 U.S. 291, 300 (1980); *see also United States v. Montano*, 613 F.2d 147, 149 (6th Cir. 1980).

As the bodycam and dashcam videos reveal, and as Officers MacDonald and Adams testified, the DPD officers did not interrogate Defendant at any time after Officer MacDonald grabbed Defendant's arm.   Immediately upon seizing Defendant, the officers did ask him whether he had any ID on his person or whether there was anything else in his pockets that the officers needed to worry about.  Those questions are legally permissible, and Defendant did not make any inculpatory statements in response to those questions.

The Court notes that Defendant has not identified any specific questions that the DPD officers asked him that resulted in him making inculpatory statements.  The videos reveal, however, that Defendant, in the absence of any questioning by the DPD officers, volunteered statements regarding possession and ownership of the gun, having served time in prison, and being a felon.   Those statements were unsolicited.  On the videos submitted to the Court, the only questions posed by the DPD officers pertained to Defendant's ethnicity, where he lived, his address and phone number, whether he wanted to call anyone, and what the phone entry meant for his "baby momma" (Defendant's words).  Defendant has not indicated that the officers asked him any other questions.

16

For all of these reasons, the Court finds that the Government has shown that Defendant was not subjected to custodial interrogation by the DPD officers or that any questions were posed to Defendant that obligated them to give Defendant the *Miranda* rights.   The Court denies Defendant's Motion to Suppress insofar as Defendant claims his inculpatory statements were illegally obtained.

Notwithstanding the Court's ruling, the Court does not approve of the DPD's apparent policy to not advise suspects of their *Miranda* rights upon arrest (Officer MacDonald and Officer Adams testified about such a policy, stating that detectives question the suspects, not the arresting officers).   The Court finds that the policy is not consistent with the broad purpose of *Miranda* to advise a suspect of her or his constitutional rights, including the rights to an attorney, to remain silent, and to know that anything the suspect says may be used against her or him in a court of law.

## V.   Conclusion

Accordingly, and for the reasons stated above,

IT IS ORDERED that Defendant's Motion to Suppress [ECF No. 16] is DENIED.


Date: August 2, 2022             s/Denise Page Hood
                                 DENISE PAGE HOOD
                                 UNITED STATES DISTRICT JUDGE

17